May it please the Court, Matthew Brill for Charter Communications. I'd like to reserve three minutes of my time for rebuttal, please. All right. There are many legitimate ways that the government can regulate calls placed without consent to mobile telephones. What the government cannot do, as it has now done in the TCPA, is to regulate those calls in a content-based manner. In essence, the government is defending the proposition that my client charter, when trying to reach its customers, if it places a call inadvertently to someone else through a reassigned cell number, can be held liable for massive damages. But private debt collectors can make an unlimited barrage of calls into your home during the dinner hour simply because they're calling to collect a government-backed debt. That cannot be defended under the First Amendment. I'd like to start with the question about standing that the Court asked under Broderick. There are a number of reasons why I think Broderick really isn't the right frame to look at this case, but in any event, that standard would be satisfied here. First, this Court has said twice in en banc rulings, in the Jornaleros de Redondo Beach case, which involved day labor solicitations, and then in Berger v. City of Seattle, that where a statute on its face addresses both commercial and non-commercial speech, the central Hudson standard cannot be applied. The language in Redondo Beach was because the ordinance, quote, did not limit its reach to the commercial context. We cannot and do not decide the ordinance's validity under the Supreme Court's commercial speech case law. And Berger similarly, when looking at distinctions among solicitors in the Seattle center, concluded that the commercial speech doctrine cannot apply. To the same effect is a panel decision from this Court in S.O.C. v. County of Clark. That's not cited in our briefs. It's 152 F. 3rd 1136. That applies strict scrutiny to handbill distribution on the Las Vegas Strip, even though it was a commercial distributor. The law on its face was read to apply much more broadly to non-commercial speech. And so there's really no ---- I'm sorry. I'm a little concerned about the Pleasant Grove case. If the First Amendment doesn't control government speech, what does that do to your case? It does nothing, Your Honor. Because in Pleasant Grove, the government made clear that restrictions on private speech still trigger the traditional First Amendment analysis. And the important thing about the content-based ---- Government restrictions. Yes, government restrictions. Excuse me. Government restrictions on private speech still trigger the same kind of analysis as in any other case. Although the government, throughout its brief, keeps referring to this debt collection exemption as if people are just stepping into the shoes of the government, that's just not how it works. These are private debts to private entities. Student loans, mortgages are almost invariably backed by the government as if it were an insurer. So you're not ---- you're not ---- What are you doing with the issue that the First Amendment doesn't regulate government speech, that this isn't government speech or that the argument of your adversary is invalid? This is not government speech, Your Honor. This is private speech. If a private debt collector calls up to say, you know, we'd like to collect on this loan, that is in no way the government speaking. The court in Pleasant Grove, I think, recognized the limits of the government speech doctrine and characterized it as narrow. And in subsequent cases like the Texas case involving the Confederate flags and the license plates ---- Is it your position that it doesn't count if the government assigns the collection to someone outside, they can only get the protection if they do the actual government collection? I think there's an important factual distinction, Your Honor. I'm not referring to government debts that are owed to the government where they use an agent to collect. These are debts owed to private entities, by and large. They're private entities that issue the loan that, for example, under the FHA mortgage programs, they're backed by the government.  And these are private entities speaking in pursuit of collecting that debt. That's why the chairman of the FCC, in criticizing this amendment, said this is just largesse to private entities that are being preferred over other private debt collectors. But why, if you're correct that this is content-based because it relates to a specific thing, which is it's a call based about your student debt, why isn't that a severable portion of the statute and then we're back where we were preamendment? Your Honor, let me start on severability with what the Supreme Court said in U.S. v. Playboy. The Court said where there's a constitutional defect, quote, the appropriate remedy is not to repair the statute but to enjoin the speech restriction. And based on that principle, every single under-inclusiveness case that this Court has analyzed and that the U.S. Supreme Court has analyzed has resulted in invalidation of the statute and not excision of the supposedly problematic exemption. Let me give you a number of examples. So you want the whole statute to be declared unconstitutional? Well, Your Honor, I think that the judgment against my client needs to be entered in our favor because it cannot be constitutionally applied to us. I think the implication of that may be that it can't be constitutionally applied to others because there is fatal under-inclusivity. I mean, we're in this weird situation where everyone's declared this statute constitutional and then the budget people get an idea, here's a way we could get some more money or get $10 million or whatever the amount is. So as I take your argument, it's that because there may have been an ill-advised amendment by the Congress to a statute that for decades has been constitutional, we now throw out the baby with the bathwater. Is that your argument? In some sense, yes, Your Honor, but that's the way this Court has always approached it. Let me give you the most on-point example. In Perry v. Los Angeles, there was originally an anti-solicitation measure that applied across the board. Los Angeles later amended the statute, just as occurred here with the TCPA, to enact an exemption for people affiliated with a nonprofit. And when this Court analyzed Perry, it concluded that that exemption for nonprofits couldn't be justified under strict scrutiny or intermediate scrutiny because there was no relationship between the nonprofit status and the purported harms at issue. It was just like Cincinnati v. Discovery Network where, you know, banning commercial handbills but not noncommercial handbills in news racks, I should say, had no relationship with the asserted governmental interest. And I'll get to this in more detail. That's absolutely the case here. These debt collection calls blow a massive hole in the asserted privacy rationale because they're among the most intrusive sorts of calls at issue. But in Perry, importantly, this Court did not invalidate the exemption for nonprofit speakers. It struck down the statute. And that's been the result in every under-inclusiveness case. It's been the result in Kerry v. Brown. There was, as you'll recall, an exemption for labor picketers and not for others. They didn't invalidate the relatively narrow exemption for labor picketing. They invalidated the statute. Same in Police Department v. Mosley, Cincinnati v. Discovery Network, and in Reed itself. There were more exceptions in that case, but they could have invalidated them. The Court didn't even entertain that mode of analysis. And there's a good explanation of why in an opinion by Judge Becker and then Judge Alito in the Third Circuit in the RAPPA case. The reason why is that invalidating an exemption results in a restriction on more speech, which is just anathema under the First Amendment. And that's why, again, this Court and the Supreme Court have never invalidated an exemption when that exemption is the cause of the content-based nature of the statute. I'd like to address the government's argument that these aren't really content-based distinctions. They're relationship-based. And Ms. Powell pointed to two cases, one in the Seventh Circuit, Patriotic Veterans, one in the Eighth, Van Bergen. This Court also addressed the same issue in its case called Bland. All of these statutes are called ADAD devices, Automatic Announcing and Dialing Devices, something of that nature. Those statutes are readily distinguishable because they do genuinely turn on the relationship between the caller and the called party. For example, a school can call parents about some event at the school, some safety issue or something else, and it doesn't turn at all on what the school wants to say. It turns entirely on the relationship. And the courts in all of those cases have said the reason those exemptions exist is a rationale of implied consent. It has nothing to do with the message or subject matter being spoken. It has entirely to do with the assumption that as a parent, I want to hear from my child's school when there's some situation, even if that means an automated call. But there's no implied consent rationale being urged here. No one is arguing that if I take out a student loan, I've somehow implicitly consented to be called by a debt collector simply because there's government backing on that debt. In fact, to the contrary, the whole premise of the government's argument here is that these are unwanted calls. And yet we're privileging calls to wrong numbers when they're to collect these private debts that are backed by the government, but not if it's a debt owed to my client, not if, importantly, other speakers are making calls on behalf of political campaigns. I mean, one of the other reasons I wanted to mention Broderick really isn't the right frame of reference is the under-inclusiveness cases looked at standing in a very different sense there. I mean, Cary v. Brown and its progeny all say that parties like Charter have the standing to challenge exemptions that apply to others. But even in Broderick, the problem in that case was that the statute was constitutional. It was a Hatch Act-type restriction to the party at issue. And the party was saying, well, what if I had a bumper sticker or what if I had a button? And those sorts of hypotheticals actually had been ruled out by the Oklahoma attorney general in that case. We had a narrowing construction that the Court said was authoritative. And in all of this Court's cases applying Broderick, the Court has drawn the distinction between, you know, those sorts of fanciful hypotheticals and sort of actual real harm. And Judge McKeon, your distinction of the Edwards case and the Vlasic case really drew on that distinction of how realistic is the harm. Well, here we don't need to speculate about whether there's realistic harm under the TCPA provision at issue. It is being used every day to sue not only commercial entities, but political campaigns. We cited at pages 13 and 14 of our reply brief a number of examples. The supporters of now Justice Kagan. Six examples. Six examples, Your Honor. A broad constitutional basis for invalidation. Well, Your Honor, those were examples. And there are countless examples of speakers being sued under this statute. This has become a cottage industry. And there's really no question that the sweep of this statute applies to all types of entities who are being sued for massive damages. And there's also no question that the statute is unconstitutional as applied to us. The problem in Broderick, again, is piggybacking on the rights of others. But we're alleging that this content-based statute, because of the discrimination it embodies, cannot be constitutionally applied to us. And that's why we think Broderick is not really the right frame of reference. One other thing I think, in addition to the under-inclusive nature of the statute, this precedence also shows that there are less restrictive alternatives available to the government. We're all concerned about getting these calls. But it's not going to be a free-for-all if this statute is invalidated on the basis that it's content-based. The Klein case that this Court adopted was one where there was a prohibition against leafleting on cars. And the Court said there could be an opt-out mechanism. And there, in fact, the burden on the consumer was much greater. You'd have to write a sign and put it in your windshield to avoid getting leaflets. But the Court said that alternative rendered the restriction over-inclusive. By the same token, this Court's decision in DexMedia was one about yellow-page distribution in Seattle, where there were payments to distribute the yellow pages. And the Court said simply allowing people to opt out of that regime was a less restrictive alternative. And the Supreme Court has made the same point in the Playboy case. Those examples just show here the government can have an expanded do-not-call list. It has never authorized use of the do-not-call list or set it up for mobile numbers. That's an obvious less restrictive alternative that would be even-handed. One other key point is I think the government's argument here. Rebuttal time? Yes, I'd like to see if that wasn't built in. That's all your time. I just wanted to let you know. I'll save the remainder for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. My name is Adrian Bacon. I'm here on behalf of Plaintiff Steve Gallion and the putative class. I want to focus first on something that appellate counsel just said. They said there's not going to be a free-for-all if the TCPA is invalidated. There's already a free-for-all. There were 40 billion robocalls placed last year to United States consumers. Forty billion. We've got data breaches that are making nationwide headlines on a weekly basis, it seems. Companies like Facebook, who was just here, and Google are constantly monitoring consumers' every move. People in 2017 filed 4.5 million complaints with the FTC over robocalls, expressing the outrage over the very types of calls that we are suing Charter on behalf of our client for making. And what Charter is really asking this Court to do, and what Your Honors are ultimately going to have to do in order to invalidate the TCPA and the manner in which they are seeking, is to rule that consumer privacy is not a compelling governmental interest. That's what this case is going to ultimately come down to, if Your Honors are going to side with Charter. And I would submit that in a day and age where privacy for consumers is more and more important every day, where more and more breaches and more invasions are escalating year after year, that this is not the time in the histories of the legal annals for this Court to make such a ruling. None of the other elements of a strict scrutiny analysis would support Charter's view. You can look at narrow tailoring, and you can look at least restrictive means, but neither of those tests would be satisfied with the arguments that are raised by Charter. You can look at Broderick, for example, as Your Honors indicated that you wanted us to address today. With respect to overbreadth, Charter doesn't have standing to assert an overbreadth argument with the context of this case, because what has been asserted by plaintiffs in this matter is that Charter placed prerecorded messages trying to solicit its goods and services to a large group of people without prior express consent. That's exactly what the TCPA was designed to prohibit. Prerecorded messages, as we cited in our papers, were of heightened annoyance to consumers because you didn't have the dignity of being able to slam the phone down on the person who was calling you. That's what the Senators held during the hearings. Solicitation calls were of the utmost annoyance because those are the types of calls everybody can't stand the most. And that's what Charter did here. Why did they not have standing here? I don't understand your position. Because their conduct falls squarely within what the TCPA prohibits, and the overbreadth arguments that they are raising have to do with other types of conduct which aren't implicated by this case. But they would say, well, even if you could look at severability, what we're really talking about here is under-inclusiveness of the statute, and therefore the whole statute goes. What is your response to that? Certainly. Charter, I think under-inclusiveness bleeds into least restrictive means to some extent. And so I'll kind of talk about them in tandem. Charter raises a bunch of potential less restrictive means that could be potentially ways that the TCPA could have been enacted by Congress to not be as intrusive into business interests. What they're arguing is that there should be a good-faith exemption. The FCC already tossed that out in the 2015 FCC order, which we cited in our papers. It was rejected by the ACA Court in the D.C. Circuit of Appeals. It was rejected by the Soppitt Court in the Seventh Circuit as being not within the statutory framework. And all of these decisions all cited the importance of consumer privacy as being a justification for that, because placing the burden on the consumer when the company who is intruding into their privacy can actually control whether they place the call or not is unduly burdensome on the consumer. It would not be a successful way of going about protecting privacy interests because tens of millions of these calls are placed every year to such consumers. And so that wouldn't accomplish the less restrictive means. And least restrictive means has to be at least as effective as the means which are employed by Congress, which they wouldn't be. Time of day limitations, that's another proposal by Charter. It's a somewhat silly notion to suggest that letting people robodial consumers from 2 o'clock in the afternoon until 5 would somehow reduce privacy invasions. It would just render us all completely inept for a few hours a day while those companies could have a free-for-all. Disclosure of caller identity is another one of the least restrictive means that Charter proposes. That is a completely useless proposition because the privacy invasion has already happened at that point. You already picked up the phone. And, you know, as the Senators stated, which was cited in the epic briefs, in enacting the TCPA, when the phone rings, it demands to be picked up. It's different than junk mail, which can be thrown in the garbage and never opened. When your phone is ringing and hooked to your hip or sitting in your living room while you're eating dinner with your family, you have to pick it up, otherwise it's not going to stop. Making people shut their phones off and shut themselves off to the rest of the world is not the solution. And as Your Honor pointed out, we don't want to throw the baby out with the bathwater by creating a situation where we are lessening consumer privacy even more than this amendment already has. The do not call list is the last suggestion of a least restrictive means by Charter. But that, again, places the burden on the consumer to affirmatively opt in when Congress has already observed that this technology is invasive and the people have had enough of it. So that's not the answer either. As to Your Honor's points, you've mentioned severability several times. I'll just say that I think that this case would be a very clear case where severability would be appropriate, even though not necessary because the TCPA would be upheld under strict scrutiny analysis anyways. And certainly there are reasons, as we cited in our paper, that you might not even get to strict scrutiny at all. But I'll leave that for Your Honors to decide. I will say that with respect to severability, the INS v. Chadha case, which we cited in our papers, quote, says, invalid portions of a statute are to be severed unless it is evident that the legislature would not have enacted this provision. Was that a First Amendment case? I'm sorry? Was that a First Amendment case? I believe it was, Your Honor. But now that I'm remembering, I'm not sure. We'll both check it out. Thank you, Your Honor. In any case, severability is possible and available here as a remedy for a simple reason. Congress enacted the TCPA in 1991, and then it amended it in 2015. And there was no discussion whatsoever in the legislative history when passing the Bipartisan Budget Act in 2015 that Congress had any intention of revising any of the other portions of the TCPA relating to robocalls placed to people to telemarket. The only prohibition that was carved out was with arguably with relation to the student loan debts. And so it is a clean case of severability where you have a completely separate enactment of Congress that can be sliced out if Your Honors believe as a last resort that that is the necessary way of going about it. I would submit that I don't think it's necessary. I think the Moser case still applies here. But even so, I would submit that for all of those reasons, the TCPA has to be upheld. It just has to be. And I'll turn it over to my colleague. Thank you. Thank you, Your Honors. May it please the Court. Lindsay Powell for the United States. Counsel for Spectrum has spent a while talking about the alternative things that the government could do to address the same problem. But we know that one of the things that Congress can do and did do to address this problem is to enact the auto-dialer restriction as it did in 1991 before the government debt exception was enacted. We know that that version of the statute is lawful. It is consistent with the First Amendment. Much of what Spectrum is arguing about in taking issue with the statute as it now exists is identifying features of the statute that existed then, too. The statute always treated the government differently. It has never applied to the government. The government has always been able to use these technologies to make these calls, whether of a debt collection variety or otherwise. And the Court did not find any problem with that in Moser or Gomez. That was a feature of the statute as it was considered at that time. It wasn't put directly at issue, but it was unquestionably a feature of the statute. What was a feature of the statute at that time? That the government was treated differently. There has never been any doubt that the government is not a person within the meaning of the TCPA. Correct. Okay. So that came about by virtue of the definition section, correct? Yes, Your Honor. And so the amendment that we have doesn't say the government. Right. So in other words, it's not carving out an exception to the exception, and the government exception still applies, correct? Yes, Your Honor. But the point I was trying to make is that Spectrum is saying that even setting aside the government debt exception, that because the TCPA has always treated the government differently, that it is therefore speaker-based and subject to strict scrutiny. And that's simply not true. Oh, I understand your point. And others of their arguments fall for the same reasons, so that, you know, they say this is very broad, campaigns are having a hard time complying, the various things they're complaining about. Almost all of these were true of the statute as it existed and as it was upheld prior to the addition of the amendment. And none of that should be considered here because we know the statute as it existed before was valid. So this is all just by way of background to help focus the argument. Well, yeah, all of that was true, and it was also true that private companies that were trying to collect government debts were incorporated in the statute, correct? Correct, Your Honor. But now what they're saying, as I understand it, is now that Congress has added this exception, and if it implicates the First Amendment as they argue, then you can't really sever it because typically we don't use severability in this First Amendment context. What is your response to that? Yes, Your Honor. So the touchstone of the severability analysis is congressional or legislative intent. And we do see that. This is the part of the analysis from the RAPPA opinion, which Spectrum likes to cite, which was omitted from their discussion of it. The RAPPA decision does say that it's unusual in a First Amendment case to sever the exception and thereby restrict more speech. But what it goes on to say is that it's unusual unless that is clearly the intent of the legislature. And, of course, this statute does have the explicit severability clause, correct? I believe that's true, Your Honor. But what makes it even clearer with respect to this provision is just that the statute was in effect and operated effectively without the government debt exception for 23 years before that was added. And there can be no doubt that Congress would not want the statute to cease to exist altogether rather than undo the narrow thing that it did in 2015. So we're not relying on an express severability provision. That isn't how we've argued it. We're relying on the intent of Congress as demonstrated by what it has done here. And the best case in support of this is the Eighth Circuit's decision in Gresham v. Swanson, which is on all fours with this one. So there the court was considering the same statute essentially that it considered in Van Bergen, where it upheld the Minnesota auto dialer restriction, notwithstanding that it contained these three relationship-based exceptions. But subsequent to Van Bergen, the legislature added one more exception that was not content-neutral, was not relationship-based. It was clearly a content-based exception. And the court in Gresham found that it was not consistent with strict scrutiny with the First Amendment. And it therefore invalidated just that exception and restored the statute to the version that existed that was upheld in Van Bergen. So that's exactly what we're proposing that the court should do here. Again, the touchstone of its analysis was legislative intent. It could tell from that history what Congress would have wanted, and it would not have wanted, to wipe out the longstanding protections for consumer privacy that had long existed and long been upheld because of a narrow change to the statute that could simply be undone. So, of course, the court shouldn't be in the business of rewriting legislative rules, but neither should it be in the business of striking down more of the law than is necessary. And here it is quite clear that all that is necessary to restore the validity of the statute, if the court thinks that there is a problem with the government debt amendment, which we, of course, do not think there is, would be to sever that narrow provision. With respect to the amendment itself, I wanted to briefly go back to the Patriotic Veterans and Van Bergen examples, which Spectrum touched on. The — it's true that the examples there, again, were based on relationships between the caller and the person being called, but implicit in that was a requirement of germaneness. Nobody thinks that the school, in calling students or parents, can try to sell them, you know, a washing machine. It needs to be about things that are germane to the relationship. So there is that further restriction implicit in that, and Congress has simply made that restriction explicit here. So not only do you need a relationship between a debtor with a past-due loan backed by the government, but the call needs to be germane to that relationship. It has to be for the purpose of collecting that debt. And so the cases are analogous in that respect as well, even though the wording of the statutes are not entirely in parallel. They certainly all relate to something germane to that underlying relationship. And it's the fact of that relationship that serves to make this — But what's your best case to show that this is a relationship issue? Do you have a case that a court has said that it's — that this amendment is a relationship and not a — We do. We do not have such a case, no. We think those out of the Seventh and Eighth Circuit cases in the closely analogous but not identical examples of the Illinois or Indiana and Minnesota statutes are our best cases for that. We don't have one concerning this particular provision. With respect to this provision, every court, to consider the question, every district court has held that even if you disagree and think this is a content-based exception, that it does withstand strict scrutiny. There has never been any doubt about the strength of the government's interest here. We're talking about remarkable intrusions into people's lives, not just in the home, but any — Do you have a case with the amendment that says that? In the district courts. Every district court, to consider the question with the amendments, has upheld it under strict scrutiny when they found that to be the appropriate standard to apply. So, again, no question as to the strength of the interest here. The Supreme Court has said that residential — sorry, residential privacy is an interest of the highest order. And the cell phone follows many of us into all the most private areas of our lives, not just the phone, but to our workplaces, our places of worship, to hospitals. And it's not always a simple matter of turning off the phone when we don't wish to suffer these intrusions. If we have dependents, if we have loved ones serving abroad, we may need to leave our phones on to be reached at all times by those we wish to be reached by. And it doesn't follow that we need to be — suffer the intrusion of this, you know, deluge of unwanted calls. And it's also worth noting, we're not talking about not being able to make calls altogether. We're talking about a particular type of technology. So Spectrum is free to make these calls, any calls it wants whatsoever. It's just whether it can save time and money by using a particularly intrusive form of technology to make those calls. And that's what Congress was taking issue with here, was the high-volume, high-nuisance value calls that we suffer when these technologies are used. Again, the case is very unusual in that we're talking about conduct that has always been thought to be regulated under a statute that the court has twice upheld. And the effort to bootstrap a narrow exception onto that concededly valid statute to call everything into doubt is highly unusual. And courts have often been suspect of the strong medicine of this type of case, of calling into doubt a broad and otherwise valid provision because of a narrow and unrelated exception. And the court should not do so here. Thank you. I referenced to the government the severability provision, which we did not really discuss directly, and I'd appreciate it if you'd comment on that. Yes, Your Honor. First, Chadha is the legislative veto case. It's certainly not a First Amendment case. Right. That's what I thought. I was just looking at it. It's the veto case. Yes. Second, Section 227, the TCPA, does not have an express severability clause. And we take issue with the idea that we know what Congress would want here. We don't know what Congress would want. Congress wanted to allow its preferred calls, but to prohibit other calls. So what is Section 608 with respect to severability of the chapter? That, I think, is a general severability provision with respect to the Communications Act as a whole into which the TCPA was placed. And you don't think that we should just ignore that? Well, I think the Congress knew that that was there when it was adding the TCPA and the amendment. But, Your Honor, while this was an amendment, there are now words that are embedded in the middle of the statute provision. It's not its own section. You'd have to blue pencil the statute. In all events, you cannot apply that retroactively to a defendant in this posture. If this were a declaratory judgment action, we were trying to figure out going forward what the statute means, there may be some opportunity that I would submit that it's contrary to all of the First Amendment precedents. I'm just trying to understand. You're saying that even though there's an explicit, which they call a severability section, is how it's titled, that we just basically ignore that? No, Your Honor. It doesn't have anything to do with congressional intent? There are two things. I don't know that applies to, you know, part of a sentence. I don't think it's intended to apply to just a few words within a sentence. I don't think it governs in the First Amendment context. And if any provision of this chapter, is that a provision? It's not, actually. What is it? It's a sentence. It's a clause within the sentence. That's a provision. It may be. I think in the First Amendment context, it's never been applied that way. And in all events, it cannot be applied retroactively to a defendant. We have to be judged based on the statute if it was constitutional at the time. This was a call placed in 2017. You couldn't fix a statute prospectively and say that's now going to apply retroactively to charter. And by the way, it would impose liability on people who were relying on this exception in the past. Any other questions? Thank you. Thank you, Your Honor. Thank you all for your arguments this morning. The case of Galleon v. Charter Communications is submitted and we're adjourned for the morning.
judges: Siler, Wallace, McKeown